Consolidated cases beginning with 22-17-65, Energetic Tank v. United States, et al. Thank you, Your Honor, and may it please the Court, David Wiener for the appellate and Energetic Tank. No reasonable mariner could have expected that a U.S. Navy warship would veer sharply off course in the middle of the Singapore Straits, precipitating the events that led to its collision with the Almut. Judge Crotty was surely right about that finding, and that the McCain was principally responsible for causing the collision. But the District Court's finding that the Almut was 20 percent responsible is based on multiple legal errors and clearly erroneous findings. In fact, it must be vacated. To understand these errors, I think it's most helpful to consider three periods of time in the accident sequence. First, the period from when the McCain illuminated her red over-red lights, 5-21-25 seconds, to a minute and 27 seconds before the collision. Second, the period of roughly 45 seconds after 5-22-31 seconds, which is right at that threshold of a minute and 27 seconds before the collision that Judge Crotty said was the point where reasonable mariners could disagree about the risk that McCain posed. And the final time period is from about 41 seconds before the collision to a minute after the collision. The District Court's findings about those first two periods of time reflect legal error, and the District Court's findings about that third period of time are based on clearly erroneous findings of fact. So let's start with that first time period. This is the period that starts at 5-21-25 seconds when McCain illuminates her red over-red lights. The District Court found that the moment that the McCain illuminated her red over-red lights, that released the ALNC from her obligations as the stand-on vessel to maintain her course and speed, and found that the ALNC was at fault for not stopping or slowing during this time period under Colreg 17A, Romanet 2. Putting aside whether the McCain properly illuminated her red over-red lights, the District Court committed legal error by misinterpreting 17A-2. And it did this by effectively erasing the key predicate for that rule, that it must be apparent to the stand-on vessel that the overtaking, quote, is not taking appropriate action in compliance with these rules. How would the ALNC have known without a book out? Wasn't that itself a violation of Rule 5? So even if you assume that the ALNC violated Rule 5 by not having a sufficient lookout, it was not causative, and I think when you look at what Rule 17A-2 requires in order to release the stand-on vessel from her obligations, having an additional lookout wouldn't have made a difference. And this gets to the legal error. Wait, wait, wait. Can you go back and look at 17A-2 for a minute? Because I may be wrong, but you can help me on this. The error, it's when the stand-on vessel is aware that the other side, the other vessel is not taking appropriate action. But doesn't red on red indicate a loss of steering? So red over red means that they're not under command. It doesn't necessarily indicate loss of steering. It means they're not under command. They could. They're not under command. And, well, I think. Is it appropriate to be not under command? Well, it's certainly appropriate to illuminate your red over red lights. The rules require that. Well, why wouldn't it trigger 17A-2? Well, I think, again, because the language that is used in 17A-2, it's not, is there another vessel that's not under command, and therefore, the stand-on vessel is released. It's that that vessel has to not be, not be, not take appropriate action. And the government, I think, and the district court relied on the definition in 3F of a vessel not under command. And that definition of not under command and the requirements of Rule 17A-2 are talking about some very different things. The definition in 3F talks about a vessel being not under command when it's unable to maneuver as required by the rules. So it's almost talking about something that could happen. It's not saying that they're already not taking appropriate action. 17A-2, however, is indicating that the vessel has to be doing something that is not appropriate under the rules. And the McCain, at that moment in time, was, doesn't meet that threshold. Well, I'm sorry, just a second. Just looking at Rule 3, vessel not under command says unable to maneuver as required, as you said. But then, and is therefore unable to keep out of the way of another vessel. That's right. And it's not saying that it is already in a condition of where it's not keeping out of the way. It's, it's, which is what 17A-2 requires. 17A-2 requires that you're doing something that's not appropriate. And I think the best way to see this is if you look at the voyage data recorder, the recording of the accident sequence. It's cited in footnote 5 in our brief. And the, there are screenshots of, of the BDR in the record starting, I think it's at 5229 in the appendix. And if you look at the screenshot from the voyage data recorder, at the moment the red over red lights are illuminated, what you see is that the McCain is doing nothing inappropriate at that time. It's steering on, it's continuing to steer on essentially a parallel course with the Alnick. It's not, it's not turning at that time. There is nothing to signal that it is doing anything at that moment that is inappropriate under the coal regs. It has its red over red lights on. And that tells surrounding vessels essentially pay attention, keep your eyes open. And that's why, Your Honor, having the additional lookout wouldn't change the vessel, the surrounding vessel's obligations under the coal regs. Having an, having an additional lookout doesn't suddenly convert the McCain into a vessel that is not taking appropriate action. What's more. Why don't you go to the second and third periods then? Sure. Yeah, I think we had very good. So in the second period of time, this is essentially the period from about a minute and 27 seconds before the collision through about 45 seconds thereafter. And during this period of time, this is after the period when it would have been possible to avoid the collision with an all stop or a crashless turn. At what point in your view was 17B triggered? So I think here, 17B probably was triggered when the master of the Alnick, Nalasko says they're doing the wrong maneuver, which is 41 seconds before the collision. So that's, that comes later. That's right, Your Honor. In this period of time, this one minute and 27 seconds before the collision, for about 45 seconds, the only way that a collision could have been avoided at this point was for Alnick to make a turn, to make a turn to port away from the McCain, which nobody believed was the correct maneuver. The government's expert, Captain Putty, said it was not a natural maneuver to make. And certainly, the Alnick's expert likewise didn't think it was appropriate at that time. That just leaves the possibility of a starboard turn. This is turning in the direction of the McCain, in the direction of a speeding warship, and hoping that you pass behind the rear of the aft of the McCain. And the findings here reflect pure legal error. Because the only way the crew could possibly have known that such a maneuver was possible, would work, would not result in an even worse outcome, is based on hindsight. The government's expert, Captain Putty, he practiced these maneuvers in a simulator 35 to 40 times, and he knew in advance that a collision was going to happen, and he knew exactly where and precisely when it was going to happen. It is only in hindsight that one could possibly know that the McCain itself was not going to course correct in a different direction, so that turning starboard would have possibly made things even worse. This was the exact basis that this court reversed.  The Alnick did nothing during this time period, right? So. So maybe if they had tried to do something and it failed, that would be a different scenario. But I think, as I read it, the distorts reasoning, you know, as to this point in time that you're focusing on is that the inaction itself was what was contributing to what ultimately happened. Well, but I think it has to be measured. There are two steps, I think, that you have to go through, Your Honor. One is asking whether or not it was a violation of the Cole regs, what the Alnick was doing, and the second is whether it was causative. And what the court said here in this period of time is that there was a violation of the Cole regs because they should have made a, could or should have made a turn, and that would have avoided the collision. But you have to understand and know that this is possible to make at that time and won't worsen the situation, and that can only be known in hindsight. That's exactly. They didn't know there was going to be a collision at that point, right? I think this was before the ARPA alarm went off, if that's what you're referring to, Your Honor. What I'm saying is I thought that what we were talking, one of the problems in this case is what they did when they, the fact that they were, they were still, they hadn't cut all their engines, and they kept their engines going. It was on autopilot at that point. And there was, and at some point, they knew that there was going to be a collision. And what time do you think that was? Well, I think it's at that 41 seconds before the collision. That's really in the third phase that we were talking about where, and that's after the point where they could have done anything to avoid the collision. With respect to this second time period, though. In terms of turning, that's what we were talking about. Correct. And the turn. That, you say that decision was before you knew that there was going to actually be a collision? That's correct, Your Honor. It occurs before NALASCO says they're doing the wrong maneuver. And at that point in time, it's really, there's no way to tell, looking at the radar, which is what they had available to them, that a collision was going to happen. This is exactly why the court, this court reversed in cases like Esso and Howlett. And I think the big thing that indicates that this is hindsight reasoning with respect to this time period is that there is no testimony from Captain Putty or any other expert that the crew of the ALNIC should have known during this time period that it could and should have made a starboard turn. An incredibly risky maneuver in the best of circumstances. And the ALNIC was expected to do this in pitch black conditions with essentially seconds to spare. So let me turn to then the third. Okay, go to that. So the third period of time is from 41 seconds before the collision to about a minute after the collision. And 41 seconds, that's the mark when the master of the ALNIC, NALASCO says they're doing the wrong maneuver. Before that, they think that the McCain is essentially trying to pass in front of and behind the Team Oslo. But at 41 seconds, they conclude that they're doing the wrong maneuver. At this point, there is nothing that the ALNIC can do to avoid a collision. It's too late to stop. It's too late to turn. And the district court made clearly erroneous factual findings by concluding that the ALNIC should have slowed and turned to try and create a glancing blow. But there is no evidence at all in the record that a glancing blow in fact would have been a less harmful outcome. The government's expert admits that he did no modeling of this. The government just says, well, there's no expert testimony required because everybody who drives a car knows that a T-bone is worse than a glancing blow. But the analogy of driving a car to these massive vessels on water is completely inapp. The example that we cited in our brief of the Titanic, which had a glancing blow with an iceberg and was catastrophic. And this, that also is a period that finding reflected clear error because there were, because there is no competent expert testimony that turning the engines off and turning the autopilot off during that time would have made any difference whatsoever. It's not common sense to turn off your engine if you're, once you hit another boat. Given the forces that were in play when the vessel struck, and essentially what happened, and given the location of where the ALNIC struck the McCain, it struck it sort of closer to the rear of the vessel, and given the angle that it was, that the vessels were at, essentially what happened is the McCain spun around the bow of the ALNIC. The ALNIC, remember, it took something like six to seven minutes after an all stop for the propeller to stop, and during that time, it moves forward about two kilometers. And so turning the engines off at the moment of impact or even 30 seconds before impact would have made no difference. And I think. You do have an engine that's going at the same speed it was before, and you have an autopilot on. So the net effect of this, which neither of which it seems to me was appropriate, you may tell me something different, but to have the autopilot, first of all, when they went into the strait, they should have had the autopilot on under the SMS rules, I think it's what they're called. So, but they had the autopilot on. The engine was still running, and then when they hit, the blow from the destroyer knocked, put the ALNIC off course, and the autopilot wanted to correct that to get it back on course. That's what autopilots do. And so it pushed back to starboard, and that kept pushing back to starboard to try to stay on course as the forces of the destroyer were pushing it to port. And then that had the effect, it seems to me, of exacerbating the gash in the side of the destroyer. And one of the questions I want to ask your adversary is how many sailors died as a result of that autopilot staying on, and so the gash was exacerbated. But it seems to me that that's a critical point. Your Honor, I think we're engaging in speculation about what would have happened in a world. But the finding that Judge Crotty made is that by turning the engine off during this post-collision period, it would have, that the failure to turn it off worsened the damage. Maybe not. You're focusing, maybe you're right. Let's assume you're right there, and the boat's still going along, the ship is still going along pretty much at the same speed as if the engine was on. But with the autopilot on, the force of the collision is causing the autopilot to keep correcting to the right, and that was a problem from the outset because the autopilot never should have been on in the first place. And I think, Your Honor, if you look, for example, at the final damage report from the Navy, which is in the appendix, I think it's 5308, 5309, and they talk, I think it's 5308, 5309, and there is a sequence there where they talk about the moment of impact. There are three or four diagrams which show the position of the vessels, and it talks about how the force of the impact was so great that the position of the rudder made no difference. I don't think the autopilot here, and remember the autopilot is just controlling the position of the rudder. The autopilot is not controlling the engine speed, the throttle. And the government certainly could have put on expert testimony to explain what would have happened if they had turned the engine off at collision, if they had turned the autopilot off then, but there is nothing in the record to substantiate the finding that making those moves at that time would have made a difference to the outcome here. That's why we think that in that final phase. So you think there's no room for an exacerbation of damage argument here as a result of that? Well, I think it would require expert testimony, and I think that in a different scenario, it is possible that you could do that without expert testimony. The distinction here is that we do have evidence in the record about how long it takes to stop the engines on the Alnick, and what happens when you turn the engines off, how far forward it continues to move, because it's such a massive vessel. And so turning it off at that time, as terrible as the collision was, it would not have made any difference. The natural forces of the momentum of those two vessels, that's what caused the McCain to rotate around the bow so that the two vessels ended up port to port. You're making an argument based in part on the Navy report. You're referring to 5307, 5308, and so on. I was uncertain about how to treat this if it wasn't introduced by an expert and gone through the whole qualification routine and so on. How should we think about, what's the right way to think about that Navy report? Well, so I think in the first instance, remember the government has the burden of proof here. And so that's why I think all of these inferences that we're drawing, they reflect evidentiary shortcomings on the part of the party that had the burden of proof. I think the Navy report is additional supporting evidence about the fact they needed expert testimony to substantiate what could have happened if the engine and the autopilot had been turned off sooner. It indicates that it was the momentum, the forces that were already in play that caused this damage. Nothing about what happened in that post-collision period of time really would have made a difference. Thank you. You're over time, but before you sit down, I just want to ask you one question about immunity. Just so I understand your argument, are you asking us to apply Singapore law to find the US immunity, that the government is not immune in the US court? So I think that is one of our arguments in terms of, and I apologize for making this maybe more complicated, but there were kind of two levels of the immunity issue. One is on jurisdiction, and one is on the substantive contribution, substantive law question. Our position in the district court was that if Singapore substantive law applies to all issues in the case, then it would make sense to look at substantive Singapore law on immunity, where there is a waiver. To the extent the court, and the district court didn't address that. We think that that would be appropriate, exactly. Obviously, we think that the jurisdictional issue is wrong. If the court, however, disagrees and thinks that US law applies on immunity, then our position is essentially, that's just the government trying to bring the FARA's doctrine in through the back door, when it can't get it in through the front door, because of the procedural posture of this case. If there are questions about that, I'm happy to answer them, but given my time, I'll otherwise reserve for rebuttal. Thank you, counsel. Thanks, your honor. May it please the court, Anne Murphy for the United States. Your honors, the district court bent over backwards to give the ALNIC the benefit of the doubt here, and I'd like to start just at the area of time part three, that began at 41 seconds before the collision. At this point, the district court had already noted all the evidence mounting up that there was going to be a collision, and it concluded that at that point, there was actual evidence that people on the ALNIC knew that, and that they knew that the McCain couldn't alter course by herself to avoid the collision, and that therefore, they had to take action under 17B. The problem was, as your honor pointed out, that ALNIC did nothing, and the experts all agreed, you've got to do something, you can't just drive straight into a collision with your foot on the gas, and especially not with your autopilot on. It's inexplicable that they say there's no evidence that the hard court turn would not have made things better. Energetic's own expert, Mr. Wilski, testified that if ALNIC had made a hard point turn 39 seconds before the collision, within this window, then the hull of McCain would not have been pierced. That's at pages- The hull of McCain would not have been pierced. That's at pages A2026 to 27 of your joint appendices, and I really hope they're not asking for expert testimony that it would not have been worse, it would not have been a better scenario if the hull had never been pierced. So, just by their own expert and by the district courts, you know, giving them a lot of leeway, they're still negligent. I'd just like to point to some expert evidence in the record that they say is missing, about this raking movement of the hull, and that the fact that they left the autopilot on, as well as being under power when they ran into the ship, made the damages worse. Mr. Wilski testifies about the scooping and raking movement at A2028 to 29. Captain Putty testifies about it at A1758, and the Marine surveyor, Pete Ryan, whose deposition testimony was entered into, and actually did discuss the Navy report, Your Honor, is at page A1866. At the part of the Navy report where the Navy report is saying that the rudder position didn't matter, they're talking about McCain's rudder. It didn't really matter where McCain's rudder was at that point because Alnick was going to slam right into her, and then, as Your Honor pointed out, do the whole course correction, scoop through the hull, and cause a huge amount of damage. By the way, do you know what the area of the McCain was that was within that extra damaged area that you're talking about? So, Your Honor- What was going on? Were those bumps? Was it living quarters? Or was it just that materiality? So, the trial was only about vessel damages, and they were stipulated. So, we didn't really get into that, which is- So, how the individuals were injured or- Well, we do know, Your Honor, since you asked out of interest, and it is in the record, because the district court was also interested to know the answer to these questions. Obviously, that's the most terrible thing that happened in this case. Alnick rams into McCain, autocorrects, and berthing five below the waterline and berthing three above the waterline are affected. There's evidence from officers Patak and Ling, I believe, that as Alnick moved around, it destroyed- it tipped some furniture over the hatch that came up from berthing five, and that people were found under there with the hatch open, but there was furniture blocking it. So, had that been an issue in the case, and had the damages not been stipulated, and had it not only been about vessel damages, it's possible that we would have had a lot more very disturbing testimony about exactly how it happened. But what we do know is, and as I say, there's expert testimony aplenty before the district court, which did a very, very careful job with the facts, that the fact that Alnick ran in under power with autopilot on was extremely significant to the amount of damages. And, as the court said, even if they have this deer-in-the-headlights feeling before the collision, once they'd actually collided with McCain, they still didn't turn off the power, and they still didn't turn off the autopilot. And I'd just like to say that when you turn off the engine of a ship, it doesn't take six and a half minutes for the propeller to stop. That's just not right. That's why you turn the engine off, is to stop the propeller. I mean, there may be, like, other, you know, momentum and other forces, but you can turn the engine off. It's not as though that's not going to help. So, I think the district court was correctly mostly appalled at the fact that even after the ship ran into McCain, she didn't do anything to stop. Can I ask you about the first period that your friend was discussing? When the red-over-red lights were on, can you explain at what point, I assume after that, 1782 is triggered? Because that itself does not seem to automatically, as a matter of law, trigger the 1782 obligation, right? Right. So, 1782 doesn't actually put any affirmative duties on the ship, on the ship that's being overtaken. It just releases it from having to. And as your Honours were talking, it's like, by lighting those red-over-red lights, McCain is signaling to other ships, I've had an extraordinary event, I can't maneuver according to the call regs. And as your Honour pointed out, most significantly here, McCain is telling them, I can't stay out of the way. So, the district court correctly said, well, you know, if you look and you see, you know that the vessel's not going to be taking appropriate action under the call regs. You are free to maneuver if you want to, if there's a dangerous situation. And so, the actual affirmative duties that were violated at that time are elsewhere in the call regs. So, the Rule 2 obligation to maintain good seamanship practices. The obligation under Rule 5 to have an actual lookout. I know that my colleague here keeps talking about a, quote, additional lookout. This was the lookout. It wasn't like some extra person. They had the helmsman working as the lookout. Rule 5 requires there to be a dedicated person looking with, you know, binoculars, going out, listening. The other person missing from the bridge, also in violation of the call regs, was the anti-collision officer. The actual person who's supposed to be looking at the radar, checking for those signs that were coming in. That person was missing, too. And so, what happened was the captain of ALNIC, instead of captaining the ship, being ready, getting information from the bridge crew, instead had his head down in a radar. And there was just a complete lack of situational awareness on the bridge, as the district court found. So, another call reg that, during this period of time that we're talking about, that wasn't observed is Rule 8. Under Rule 8E, if in doubt, you want to slow down, see if there's any action that you should take. ALNIC, as the district court pointed out, just kept plowing ahead at the exact same speed, exact same course, and just didn't do anything. If your honors have no further questions, I'll sit down. Thank you. May it please the court. Paul Hoffman, Hoffman & Schweitzer. I represent, in this case, 27 of the injured Navy personnel. And I'm also speaking on behalf of several other personnel, other claimants. My main focus is going to be on your de novo review of the choice of law, but I do want to quickly address the liability aspects. Clearly, it's relevant to my clients. Under another treaty called the Standards for Training, Certification, and Watchkeeping, which Singapore, the United States, and Liberia both have acceded to, there are specific mandatory rules that were violated here. Judge Crotty did not mention it in his opinion, but it was briefed to the court, and this court, I think, can take judicial notice of that law as well. That law specifically says that a dedicated watchkeeper is to be on the bridge at all times with no other duties other than doing watchkeeping. It also says that the helmsman can have no other duties other than operating the helm. And third, it says when you're in restricted waters, you must, again mandatory, go off of automatic autopilot and go to hand steering. These are rules, and we've cited it in our brief, and I wanted to point that out. And there's one other thing I wanted to raise to your honors. There was this discussion about what happened in the first 120 or so seconds before the collision occurred. And counsel has said there should have been expert testimony, whatever. There was an expert who testified, and that was Captain Nolasco. And he testified that if within 100 seconds of the collision he had gone to all stop, the collision would have been avoided without him doing any modification of his navigation. No turns would be necessary. And that was confirmed by defendant's expert, Wilski. The reason why that, I point this out, is when he gunned at the log, when he made false entries in the log, he specifically said that at 522, he turned off all the engines. What would be significant in his mind to put that in the log, other than for him to be protecting his self from being accused of not taking the appropriate step? That shows, to me and to my clients, that's an admission of liability on his part. That if he had done so, he knew that at more than 100 seconds before that collision, if he had just turned off the engines, the collision wouldn't have occurred. I want to point that out. It is mentioned in the brief by Sanfilippo. And I wanted to reiterate it to the court. Again, the main focus of my briefing on behalf of my clients is that Judge Crotty made an error of law by determining that not only would liability law be covered by the law of Singapore, but also damages. Judge Crotty gave a brief discussion about the Lauritzen and Rhoditis factors, Romero as well, and then failed to actually apply the standards that the Lauritzen and Rhoditis cases require. And this circuit in Blue Whale several years ago and in other cases has frequently said that when making a maritime choice of law decision, you must apply the Lauritzen and Rhoditis Romero trilogy of cases. Judge Crotty recognized first that this was a United States flag warship, that every one of the claimants is a U.S. citizen, including the families of the decedents who all were U.S. citizens, that the flag of the Alnick was Liberian, and that the statutory law of Liberia says that the general maritime law of the United States will apply to Liberian vessels. Eighty percent of the fault, Judge Crotty found, occurred through faults of U.S. citizens on the bridge of the Alnick. All of the injuries occurred in the bridge of the McCain. All of the injuries occurred in the McCain. There is absolutely no reason why the law of Singapore should apply to the damages in this case. Judge Crotty failed to give any justification for why the damages law of Singapore should apply to my clients and to the decedents. Your claims are still pending in the district court, right? I'm sorry, sir? Your claims are still pending in the district court? Yes, they are. Phase two is in the process. We're still doing discovery. So whenever that's done, you will be able to appeal this aspect of Judge Crotty's? Yeah, and I see where you're going, Judge. And there is the collateral order doctrine where what you're suggesting is that we would have to have 50 trials, and each one of those would then have to have, which could stretch out over years, and each one of those would then have to file an appeal. It would be totally wasteful and expensive for the petitioners. It doesn't have to go down that way, right? You could seek certification before that. If that's the direction it starts going, you could ask for certification to appeal the legal issue. Well, that's true, Judge, but since this was already a final judgment, we cross-appealed here as if it was a certification. And certainly, there is this issue about the appealability, but I think that our briefing shows that the court does have the discretion to accept this appeal. And I think it's necessary, and certainly for judicial efficiency, for us to have that appeal held. Now, if I may, Judge, go on to the secondary argument we have made here, is that under, that Judge Crotty was advised, listen, you do not have to, you can split the decision of choice of law as to liability versus the damages. And it's that issue called deprecage. And we have briefed it and explained to the court that it is recognized, at least by the Second Circuit and by five other circuit courts, that as a rule of law that you look at the points of contact, not only to the liability aspects, but you can split looking at liability under one law and then applying a different law. And in this case, the different law would be the law of the United States. And I think it's ironic that the petitioners came into this, into the district court, asking for application of U.S. damages law. The Limitation of Liability Act is not a limitation of liability concept. It's the limitation of damages that a ship owner might be exposed to. They also claim that under the Death on the High Seas Act, the decedents, the Gold Star families would have to apply U.S. law. So to me, it's not only ironic, it's almost hypocritical that they now come here and say, oh, for the personal injury people, you have to apply Singapore law, which has no dog in the hunt, as they say. There's been no point that Judge Pratty raised that said Singapore has an interest in telling these U.S. seamen in a U.S. court that you should have to apply some sort of Singapore damages law. So therefore, I seek the court to make that decision that, and it's a de novo review, that at least as to the damages aspects, U.S. law should apply to all of these petitioners, to all of these claimants in the petition. Without any further questions, thank you, Your Honor. We'll hear a rebuttal. Thank you, Your Honor. There are three points I'd like to make. Starting first, briefly on the issue of choice of law, we do think that there's not appellate jurisdiction. Your Honor is correct that these cases are proceeding in the district court. Choice of law decisions exactly like this one are made day in and day out across the street in the Southern District, and those orders are almost never subject to interlocutory appeal. Certainly in a case like this one, where the decision on choice of law did not terminate a claim, there's no basis for appellate jurisdiction at this time. Those cases are proceeding in front of Judge Pratty. No trial dates have been set. The cases are being resolved, as Your Honors have seen, through negotiations and settlement. If any cases are tried and there is a final judgment, there could be certification, there could be appeal on any of those individual cases without having to undergo the doom and gloom scenario that counsel has portrayed about years and years before this issue gets resolved. I think the, and one other point on choice of law that I did want to clarify is that it is not the case currently that the Death on the High Seas Act applies to the wrongful death plaintiffs. In fact, reversal on choice of law and application of U.S. law might result in that outcome. As currently stands, Singapore law applies to all of the claimants, wrongful death claimants, and personal injury claimants. The next point, I'd like to go to this issue of 1782 again, and there's a couple of quick issues I'd like to note. The district court has essentially reduced 1782 to one issue, whether the red, over-red lights are showing. And that is a fundamental misinterpretation of the rule. There's no case law that supports that. The cases that the district court and that the government cited, cases like the Iran-Torab and Qosirzina, those were situations where the overtaking vessel was actually doing something inappropriate that was observable by the stand-on vessel. It's significant to note that under the coal regs, merely turning on your lights and being a vessel not under command, that does not change your obligations as the overtaking vessel. 17D makes this abundantly clear. In Rule 13A, it likewise includes, it essentially carves out the obligations of the overtaking vessel and says that you remain the overtaking vessel and you have those responsibilities and the vessel being overtaken here, the ALNIC, it continues to be the vessel that is being overtaken. Notably, Commander Sanchez, his testimony in this case, he believed that the moment he turned on his red-over-red lights, everybody had to get out of his way because he believed that that made the McCain the stand-on vessel. That is fundamentally incorrect. The interpretation of the rules that the district court adopted with respect to 17A2 will create perilous circumstances by requiring- I'm sorry, you say that Colonel Sanchez testified. Commander Sanchez, that's correct. Has that been the United States' position as well? I believe the United States recognized that that was incorrect. That is not a correct interpretation of the COLREGS. Yeah, but Commander Sanchez made a number of errors. That's correct, Your Honor. But what the district court's interpretation and the government's position is going to do is it's going to force the stand-on vessel to act prematurely. They're importing all of these other- No, that's right. I mean, 17A2 could be, as I read the district court's understanding of it, is putting a vessel on notice that a failure to act could result in potential contributory negligence. And that seems to be what happened here, that you are now on notice that if you don't do anything, that could also be the wrong thing to do. But in a situation like we encountered here, the ALNC has obligations not only to the McCain but to the other vessels that are overtaking it. And it can't just slam on its brakes when it has the Guangzhou right behind it. It has Hyundai Global behind it. It has obligations to those vessels as well. And merely turning on your red over red lights at that point in time, when there's nothing to indicate that the McCain is doing anything inappropriate, that is a fundamental alteration of what the rules say. The drafters of the coal regs, they could have written 17A2, Your Honor, to say exactly the way you articulated it and the way that the government has articulated, but they didn't do it that way. And they carved out all of these other obligations in the coal regs. Council referred to Rule 8E and the obligation to slow or slacken your speed to avoid the risk of collision. But look at Rule 8A. It carves out the other rules of that part, which includes Rule 17. The ALNC was not permitted to stop or slow at that point in time. Your Honor, do you see my red light? I did want to just try and address one thing about the contribution issue, if it's okay, Your Honor. And that is just on this issue of immunity and jurisdiction, that the government is really pressing a novel and unprecedented extension of the FARAS doctrine. None of the cases that they have identified, that the district court relied on, involved a situation like this one. There are cases involving third-party claims that have been subject to FARAS and CENCIL-ARROW, but not all third-party claims are created equally. All of the cases they rely upon are situations where the U.S. was an unwilling litigant in the litigation. Here, we have two express waivers of sovereign immunity for these very statutes, for this very situation. We know that Congress adopted those statutes to address situations exactly like this one, where the U.S. asserts an affirmative claim and then attempts to wield sovereign immunity as a shield. Congress didn't want that to happen. And extending FARAS in this circumstance creates an unprecedented extension, especially in a situation where the government was 80% at fault. They get to walk away with nearly $45 million and they avoid all further responsibility for their negligent conduct. The FARAS doctrine is a bottomless pit of indefensible outcomes and it is legally unsustainable. We would ask this court not to allow its further extension. Thank you, your honors. Thank you, counsel. Thank you all. We'll take the case under advisement.